John J. PATTERSON et al., Plaintiffs,

v.

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, et al., Defendants.

No. P–CIV–75–0048.

United States District Court, S. D. Illinois, N. D.

Jan. 6, 1976.

Roy G. Davis, Peoria, Ill., for plaintiffs.

David Leo Uelmen and Gerry M. Miller, Milwaukee, Wis., Sidney D. Davidson, Gary S. Clem, Peoria, Ill., Raymond F. Beagle, Jr., Paul Scott Kelly, Jr.,

Thomas J. Jones, Jr., Kansas City, Mo., for defendants.

## DECISION AND ORDER

ROBERT D. MORGAN, Chief Judge.

This case is brought under Section 301 of the Labor Management Relations Act (29 U.S.C. § 185) and is before the court on cross motions for summary judgment, it being conceded by all concerned that there is no genuine issue of material fact.

Plaintiffs were employed as truck drivers by defendant Arkansas-Best Freight System, Inc. (herein ABF) and were represented in collective bargaining by defendants International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (herein IBT), its Central States Drivers Council, and its Local 627, through a National Motor Freight Agreement and Central States Area Over-the-Road Supplemental Agreement for the period July 1, 1973, through March 31, 1976. Plaintiffs were displaced and laid off through a change in operations by ABF, and they sue for damages against all defendants and injunction against continued violation of the agreement by the employer and failure of fair representation by the unions, alleged to continue through such displacement.

It is clear that the approved change of operations resulted in efficiencies which required fewer drivers than were formerly needed and used by ABF to haul freight by truck between the same origins and destinations. Accordingly, the basic question is whether plaintiffs or other drivers are the proper ones to be released under the terms of the collective bargaining agreement.

Plaintiffs and several other ABF drivers were domiciled at a Peoria, Illinois, relay point. All of them were members of Local 627, and their wages, hours and working conditions were governed by the Agreement and Supplement referred to above, which IBT and the Central States Council did help negotiate and do help administer. The Peoria relay point did not originate freight, but supplied drivers to take over from other drivers arriving at Peoria and drive "turnaround runs" to Chicago and return, to Milwaukee and return, to St. Louis and return, as the case might be. The other drivers, from whom Peoria-based men took over, obtained required rest at Peoria in the meantime. More specifically, on the program which existed up to May 11, 1975, the date of plaintiffs' layoff, plaintiff Thompson drove a regular bid turnaround run between Peoria and Chicago, and plaintiff Patterson drove a regular bid turnaround run between Peoria and St. Louis; other high seniority drivers not involved in this dispute drove regular bid turnaround runs between Peoria and Milwaukee, and plaintiffs Wyatt and Vandermoon, being the lower seniority men at Peoria, drove "extra board" turnaround runs to Chicago, Milwaukee and St. Louis, as needed. All drivers performed added assignments as needed and requested.

It is clear that an employer signatory to the National Master Freight Agreement has the right to make changes in its operations. However, Article 8, Section 6, of that Agreement provides:

"Present terminals, breaking points or domiciles shall not be transferred or changed without the approval of an appropriate Change of Operations Committee. Such Committee shall be appointed in each of the Conference Areas, equally composed of employer and union representatives. The Change of Operations Committee shall have the authority to determine the seniority of the employees affected and such determination shall be final and binding. * * * This committee shall also have jurisdiction over the closing of terminals in regard to seniority."

ABF proposed changes to (1) abolish the Peoria domicile; (2) redomicile home terminal of Peoria-St. Louis turn runs to St. Louis; (3) offer two Peoria domicile drivers the opportunity to transfer to St. Louis and dovetail into seniority roster there in order to maintain the Peoria-St.

Louis runs from there; (4) establish Kansas City-Chicago through runs, not going through Peoria, in place of Kansas City-Peoria through runs with relay to Chicago, with Milwaukee to be served from Chicago; (5) lay off of five Peoria drivers. The proposal was approved, insofar as here involved, by the appropriate Change of Operations Committee at a meeting in March 1975, where Mr. Waters of Local 627 argued against the change, in the interest of saving the jobs of Peoria drivers, by arguing that the Kansas City-Chicago run was too long in time and distance to be workable under ICC regulations. While there was express union concern over layoff of high seniority men, no contract rights were asserted, on the ground that other drivers would be taking over the work formerly done by the Peoria men. (This was argued without success at the May 1975 meeting of the same committee.) The only suggestion of such at the March meeting was Mr. Water's statement: "I don't know how they can say they have no place to go, or no freight to follow."

The announced decision of the committee, as shown by transcript of the March meeting, was in the following words:

"It is the decision of this committee that the change of operations be approved to this extent: that the five men in Peoria may be laid off, to be offered work opportunity before new hires at other places as work opportunity might arise. The two men will not be redomiciled to St. Louis but will remain in Peoria.

"You can run in accordance with your proposed change of operations out of Kansas City to Chicago via to Milwaukee, etc. We are not going to reverse the turns from Peoria to St. Louis. Those men will remain. However the five men will be laid off at Peoria and won't have any rights on the work described in the change."

Defendants all argue that the committee was fully within its rights, duty, and contract jurisdiction, and that it was simply giving effect to the contract provision contained in Article 5, Section 5(c), as follows:

"When a branch, terminal, division or operation is closed and the work of the branch, terminal, division or operation is eliminated, employees who are laid off thereby shall be given first opportunity for available regular employment at any other branch, terminal, division or operation of the Employer within the Area of the Supplemental Agreement under which employed. The obligation to offer such employment shall continue for a period of three years from the date of closing. However, the Employer shall not be required to make more than one offer during this period. Any employee accepting such offer shall pay his own moving expenses. If hired, he shall go to the bottom of the seniority board but shall have company seniority for fringe benefits only."

Plaintiffs argue that the foregoing contract language is clearly inapplicable because the work was obviously not *eliminated*, but was transferred to others to perform, and that the appropriate contract provision for application is Article 5, Section 5(b)(2), which provides:

"When a branch, terminal, division or operation is closed or partially closed and the work of the branch, terminal, division or operation is transferred to another branch, terminal, division or operation in whole or in part, employees at the closed or partially closed down branch, terminal, division or operation shall have the right to transfer to the branch, terminal, division or operation into which the work was transferred prior to the recall of laid off employees at that location. Such employees transferring as a result of an approved change of operations, shall be dovetailed with their full classification seniority (city or road) into the active seniority roster at the point of redomicile, excluding those employees on letter of layoff. If and when additional employees are required at the point of redomicile, employees on layoff status at that location shall be re-

called. When recalled, such laid off employees shall be dovetailed with their full seniority."

It is also clear that the employer must pay moving expenses in case of redomicile and dovetailing of seniority, but has no such obligation for any resulting move under the section applied here.

Section 7 of Article 5, however, also provides:

"The parties acknowledge that the above rules are intended solely as general standards and further that many factual situations are presented to Committees which necessitate modification or amendment. Accordingly, the Employers and Unions acknowledge that questions of accrual, interpretation or application of seniority rights may arise which require different treatment and it is understood that the Employers and Unions jointly involved, and/or the respective grievance committees may mutually agree to such disposition of questions of seniority which in their judgment is appropriate under the circumstances. The Change of Operations Committee provided in the National Master Freight Agreement or the Supplemental Agreements shall have the authority to determine the establishment and application of seniority in those situations presented to them. In all cases the seniority decisions of the Joint Committees, including the Change of Operations Committees and Subcommittees, established by the National Master Freight Agreement and the respective Supplemental Agreements shall be final and binding."

Plaintiffs were laid off on May 11, 1975, along with one other driver who did not join in the suit. All five had requested by letter on April 22, 1975, a review of the Change of Operations Committee decision through the grievance machinery of the applicable agreements. Having received no response to that request, plaintiffs filed this action on May 27, 1975. They want damages, actual and punitive, against ABF for claimed breach of the collective bargain-ing agreement and against the unions for claimed failure of fair representation thereunder. They also want an order permitting them to "redomicile to those branches, terminals, divisions or operations of the defendant employer currently performing the work performed by the plaintiffs prior to the effective date of the change of operations."

The grievance machinery of the collective bargaining agreement is set forth in Articles 7 and 8 of the National Master Freight Agreement and in Articles 44 and 45 of the Central States Over-the-Road Supplement. They provide for binding decisions by majority vote of local, area, state or national joint union-employer committees, for possible "umpire handling" of deadlocked cases upon majority vote therefor, but "Otherwise either party shall be permitted all legal or economic recourse." It appears that plaintiffs are appropriately in court on the basis of their allegations and viewpoint.

The unions here take the position that there can be no breach of the duty of fair representation, because they did represent the interests of the plaintiffs before the Change of Operations Committee "in an honest, sincere and informed manner." They assert that it cannot be reasonably contended here that any union conduct was "arbitrary, discriminatory, or in bad faith." See Vaca v. Sipes, 386 U.S. 171, 190, 87 S.Ct. 903, 916, 17 L.Ed.2d 842.

The unions further contend that the decision of the joint union-employer committee here is the equivalent of an arbitration award in a collective bargaining setting, which the courts must not disturb "unless dishonest, capricious or beyond its authority." They rely upon the "Steelworkers Trilogy", 363 U.S. 564ff., 80 S.Ct. 1343ff., 4 L.Ed.2d 1403ff.; Drivers Local 89 v. Riss & Co., 372 U.S. 517, 83 S.Ct. 789, 9 L.Ed.2d 918 (1963); Humphrey v. Moore, 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964), and, most recently, Cannon v. Consolidated Freightways and Teamsters Local 710, 7th Cir., 524 F.2d 290, decided October

28, 1975. The principle that the courts will not supplant a decision of an adjudicatory tribunal set up, in collective bargaining unless it is arbitrary or clearly unfair is firmly established in federal labor law.

At the oral argument on these motions, the unions justified not even prosecuting a grievance, as requested by plaintiffs, on the ground that it would have been futile to do so because a Central States joint committee (Change of Operations Committee) had already specifically directed what took place here, that it was within its bargained duty to do so on a final and binding basis, and that consequently the result could not be changed by any joint union-employer grievance committee to which a grievance might properly be carried.

ABF agrees with the foregoing principles and precedents, agrees that the unions are not liable, and agrees with the binding nature of the result achieved by the Change of Operations Committee, as far as its obligations or any rights of plaintiffs are concerned. ABF asserts that the correct contract provision was correctly applied. It argues also that there could have been no transfer of work on this change of operations, especially to Kansas City drivers who drove on into Chicago, because no additional drivers were required to do any such transferred work. Fundamentally, however, it contends that the entire collective bargaining contract scheme of trucking industry labor-management peace and self-government as a whole, requires recognition of the authority of the joint Change of Operations Committee to resolve competing seniority rights of employees affected by changes which that committee approves. The court must agree that ABF and the unions are right on the ultimate issues before the court.

■ Five drivers are clearly required to be laid off in this situation, and the contract as a whole simply does not give plaintiffs a clear and positive right to exercise their seniority over anyone else on any other seniority list. It

does give the Change of Operations Committee authority to decide such seniority conflicts, and it simply cannot be reasonably concluded that they did so arbitrarily or capriciously, or in any way wrongfully, even though reasonable minds might differ on the justice of the choice they made. Clearly, the unions did support the position of plaintiffs in good faith, as far as it was reasonable to do, and none is guilty of failure of fair representation.

It does seem clear, as a matter of fact, that the work Peoria drivers previously did was transferred to the drivers who extended their former runs from Kansas City to Peoria on into Chicago. It is beyond dispute that Chicago is a greater distance from Kansas City than is Peoria. The hauling of whatever freight is involved that extra distance was formerly done by Peoria drivers and is now done by someone else. That change is unquestionably a transfer of work, which quite obviously brings into consideration Article 5, Section 5(b)(2), with its redomicile and dovetailing of seniority provisions, rather than Section 5(c) which was applied here, as if all the work involved had been eliminated. If these two alternative contract provisions were the only ones involved, this court would feel bound to conclude on the facts of this case that the committee decision was arbitrary and unfair because based on a pretense that work had been eliminated rather than transferred, at least in part. However, these are clearly not the only applicable provisions of the contract.

■ It is noted that the basic seniority plan established by Article 5 of the National Agreement and Article 43 of the Supplement here is "Terminal Seniority," as distinguished from relative seniority throughout the employer's system. It is elementary that plaintiffs have only such seniority rights as the contract gives them. They have no right to exercise Peoria seniority to displace drivers at any other terminal unless the contract provides it, and Section 5(b)(2) is the only provision which might be said to do so.

It may not be overlooked that Section 7 of Article 5, quoted in full above, provides:

> " * * * that the above rules are intended solely as general standards * * * that questions of * * * application of seniority rights may arise which require different treatment * * *. The Change of Operations Committee * * * shall have the authority to determine the establishment and the application of seniority in those situations presented to them. In all cases the seniority decisions of the Joint Committees, including the Change of Operations Committees * * * shall be final and binding."

Furthermore, Section 6 (entitled Change of Operations) of Article 8 (entitled National Grievance Procedure), also quoted more fully above, provides specifically:

> "The change of operations committee shall have the authority to determine the seniority of the employees affected and such determination shall be final and binding."

■ This total contract picture leads inescapably to the conclusion that the committee decision must stand, in the absence of any clear showing of some specific unfairness to plaintiff in relation to the other employees now doing the work in dispute. As indicated above, the fact that some or all of plaintiffs may have been employed longer by ABF than some or all of such other drivers is not such unfairness *per se*. To so hold would accord greater importance to system-wide "seniority" than does the collective bargaining agreement.

■ Plaintiffs' argument is bottomed entirely on the contention that: "Article V, Section 5(b)(2) creates system-wide seniority for allocating work among employees * * *" when some are to be laid off in these circumstances. Failure to see that this particular subsection was applied is the alleged breach of contract by ABF justifying suit, and failure to fight harder for such application is said to be failure of fair representation by

the union defendants. This would make a firm and unqualified contract right out of what the contract says is a "general standard" for the guidance of joint committees such as the one which acted here in deciding competing seniority issues. Even if the court did agree with plaintiffs as a matter of abstract justice or equity, it could not judge the committee decision invalid.

Plaintiffs rely on *Butler v. Local Union 823*, 514 F.2d 442 (8th Cir. 1975), for the assertion that to ignore Section 5(b)(2), without specification of conditions requiring it, when work has been transferred rather than eliminated, is, *per se*, arbitrary and unfair. That case, however, involved a merger of two employers, a jury verdict on facts, discrimination on a desired return from layoff status, different contract provisions, and dicta therein tends to support the proposition for which the case is cited, only tangentially at best. There is no argument with the proposition that any contract means what it says; but it is necessary to look at all of its provisions and to give meaning to each, if possible. That case does not stand for any proposition, such as that a joint labor-management tribunal with clear authority to determine whose seniority is applicable in a conflict between two groups of employees must give persuasive reasons for its decision, as plaintiffs appear to contend.

Plaintiffs argue that the union members on the Change of Operations Committee had a duty to contend for them and not to abandon them in the deliberations of the committee, but this overlooks completely that the price of prevailing by these plaintiffs is layoff of five other drivers from one or more other terminal seniority lists into which plaintiffs wish to be dovetailed, instead of being laid off themselves. The unions, except possibly for the Locals taking the part of their own members, have fair representation obligations to both groups. ABF is essentially uninterested in this choice, except possibly to the extent of some moving expenses.

■ Plaintiffs say Local 627 represented them only in a perfunctory fash-

ion, and this is not fair representation. It is clear, however, that the joint committee, which, incidentally, had no members either from ABF or from any of the Local involved here, had full authority for what it did, and that being true, a grievance by plaintiffs was without merit. There is no failure of fair representation in refusing to process such a grievance.

The other cases cited by plaintiffs are inapposite here, and the language quoted therefrom appears either supportive of this determination or unpersuasive to the contrary. This court does not consider that the "indicia of fairness" are absent in the committee determination here. It is thoroughly understandable that plaintiffs are distressed, and presumably there are five drivers elsewhere who would be laid off if plaintiffs prevailed who are relieved, if they know about it. This represents neither unfairness *per se*, breach of contract by ABF, or failure of fair representation by the unions, or any of them.

It is ordered, accordingly, that defendants' motions for summary judgment are allowed, plaintiffs' motion is denied, and judgment is entered in favor of defendants.